[Crim. No. 2350. In Bank.—June 6, 1921.]

In the Matter of the Accusation of the SAN FRANCISCO
   BAR ASSOCIATION, Plaintiff, v. MORRIS OPPEN-
   HEIM, Defendant.

[1] ATTORNEY AT LAW—MISCONDUCT AS POLICE JUDGE—DISBARMENT
   PROCEEDING—INSUFFICIENCY OF EVIDENCE.—In this proceeding for
   the disbarment of an attorney and counselor for alleged misconduct
   with relation to certain matters coming before him as police
   judge, the evidence is held insufficient to prove any of the charges
   contained in the accusation.

[2] ID.—MISCONDUCT OF ATTORNEY—CHARACTER OF PROOF.—Charges
   of specific misconduct on the part of an attorney at law can
   be sustained by a court only upon satisfactory proof of the par-
   ticular misconduct alleged.

PROCEEDING for the disbarment of an attorney and
counselor for conduct involving moral turpitude. Dis-
missed.

The facts are stated in the opinion of the court.

John O'Gara, Joseph J. Webb, M. C. Sloss and Max
J. Kuhl for Plaintiff.

Thomas B. Dozier and A. S. Newburgh for Defendant.

ANGELLOTTI, C. J.—This is a proceeding instituted in
this court for the disbarment of Morris Oppenheim, an
attorney and counselor, for conduct involving moral turpi-
tude. Defendant was at all the times mentioned in the ac-
cusation one of the police judges of the city and county
of San Francisco, and, as in the case of *San Francisco Bar
Assn.* v. *Sullivan,* 185 Cal. 621, [198 Pac. 7], all the charges
against him are for acts and conduct on his part with rela-
tion to matters coming before him as such police judge. Three
separate specific charges against the accused are made by
the accusation. The accused denied the truth of each charge.
By order of the court, the evidence in support of and
against the charges was taken by the chief justice, and the
transcript of the evidence taken has received full considera-
tion at the hands of each member of the court.

The charges are of the same general nature as those made against John J. Sullivan in the proceeding referred to above. In the opinion in that matter we sufficiently discussed the rules of law applicable, and it is not necessary to repeat that discussion here. In this matter, as in the Sullivan case, the only direct evidence of guilt of the accused of any of the specific offenses charged is that of C. Vincent Riccardi, whose credibility as a witness is fully discussed in the opinion in that case. It is unnecessary to repeat that discussion here, further than to say, as we substantially said there, that we can accept his testimony as true only in so far as it is substantially corroborated by other evidence. We had occasion in the Sullivan case to discuss the business of Peter P. McDonough and the intimate relations existing between him and the accused therein. The same sort of intimacy existed between him and the accused here, and all that is said in the opinion in that case about these matters is equally applicable here.

The specific charge mainly relied on is the first in order in the accusation, being with relation to the conduct of the accused in a matter pending before him as a committing magistrate, in which one George Imperiale was charged with the crime of manslaughter. The charge is that while this matter was so pending before him, the accused entered into a conspiracy and agreement with one Peter P. McDonough wherein and whereby it was understood and agreed that accused, as police judge, should make such orders in regard to the bail of Imperiale that the latter would be induced to discharge his then attorney, one John V. Filippini, and employ in his place C. Vincent Riccardi, and also to pay for attorney fees and his release from custody and for the dismissal of the case five hundred dollars, of which sum McDonough was to receive a part; that, in pursuance of such corrupt agreement, accused, on April 24, 1919, first made an order fixing the bail at five thousand dollars bond or two thousand five hundred dollars cash, and subsequently on the same day made an order holding Imperiale without bail, thus inducing Imperiale to discharge Filippini from his employment and to employ Riccardi in his place, and that then accused made a third order, fixing the bail at one thousand dollars, which amount was furnished by McDonough, and Imperiale thereupon released; and that on

or about May 23, 1919, the case was finally dismissed; and that the sum of five hundred dollars was paid by Imperiale for attorney fees and for his release, and for the dismissal of the case, of which sum McDonough received two hundred dollars. There is no claim either in the accusation or the evidence that accused was to receive or did receive any money in this matter.

Imperiale, who was engaged in the business of running an auto stage or truck, had, in operating his car, run into and killed a child. The charge of manslaughter was based upon his alleged negligence in this matter. In so far as the dismissal of the charge by accused is concerned, it is not claimed that the accused was not fully justified in his action by the facts. No effort was made by the accuser to show what an investigation of the facts disclosed. Mr. George B. Keane, an attorney employed by the parents of the dead child, testified that he fully investigated the facts, and concluded that there was no case against Imperiale. It is undisputed that in open court he so stated to the accused judge and asked that the matter be dismissed. In so far as the record shows, there was no probable cause shown for believing Imperiale to be guilty of the crime with which he was charged, and the dismissal was proper.

It is solely in connection with the matter of the bail of Imperiale that anything improper appears. Imperiale, an ignorant foreigner, was in custody on the charge of manslaughter, having been arrested the night before. Riccardi had such information as to lead him to the conclusion that he had some property and sufficient resources to enable him to pay a large amount of money to gain his liberty. Here was a fertile field for development in the eyes of Riccardi. An intervening obstacle to such development was the presence in the case of Mr. John V. Filippini as the attorney of Imperiale. Mr. Filippini was an attorney at law of good repute, without much police court or criminal practice experience, who as a lawyer had previously done some business for Imperiale and had his confidence. In consequence of this he had been engaged to appear for him in this matter, and was, with Mrs. Imperiale, in and about the Hall of Justice and the courtroom of accused on the morning of April 24th, when Imperiale was first brought into court to answer to the charge, engaged in an effort to obtain the release of Imperiale on bail. It was consid-

ered by Riccardi to be necessary to exclude Filippini from the case and to obtain his own employment in his place. The plan adopted to accomplish this was to bring Imperiale and his wife and Filippini to a conclusion that Filippini could not obtain an order for such release on bail, or other favorable action in the case, and that Riccardi could obtain his release at once and eventually a dismissal of the case.

There can be no doubt that Imperiale and his wife and Filippini were prevailed upon to believe that Filippini could do nothing for Imperiale in that court, and that with the assent of Imperiale, Filippini withdrew from the case, and Riccardi took charge. Except for the continued representations and insinuations by Riccardi as to his ability to accomplish results and the lack of knowledge of Filippini as to how things must be done in order to obtain favorable results in that court, the potent consideration leading the parties to the conclusion that Filippini could do nothing was certain information given them as to an alleged change made by the accused in the matter of the bail. It is the alleged willful participation by the accused with Riccardi in this matter, as well as in the original fixing of bail, that is mainly relied on by the accuser.

Riccardi's story is, in brief, substantially as follows: All his dealings in the matter were with McDonough, and at no time did he speak to the accused about the case. Before court convened on the morning of April 24, 1919, he went to McDonough's place of business and acquainted him with the prospect of mutual gain in the Imperiale case in the event that he was employed as attorney in place of Filippini. McDonough agreed to help and Riccardi divulged his plan, which was to have the judge fix the bail at so high a figure as to make it impossible for Filippini to obtain it. McDonough said he would communicate with the judge at once. Riccardi went back to the courtroom, arriving there before court was convened. After the accused took his place on the bench for the disposition of the business of the day's calendar, application was made by Filippini for the fixing of bail in the Imperiale case. The judge fixed it at five thousand dollars bond or two thousand five hundred dollars cash. Filippini left the courtroom saying that he would endeavor to obtain it. Ric-

cardi thereupon went to McDonough again and told him that Filippini would probably get the required bond, and suggested that he have the accused raise the bail or refuse bail altogether. McDonough said he would do this. Riccardi went back to the courtroom a little later. Court had adjourned and the accused had left the courtroom. Imperiale and the other prisoners were still in the dock in the courtroom. He, Riccardi, says that he was informed by the clerk of the court that an order of ''no bail'' had been made. It was at this stage that Filippini withdrew from the case and Riccardi became attorney for Imperiale. He then went back to McDonough's place of business, in company with Mrs. Imperiale, and sought an order fixing the bail at one thousand dollars cash. McDonough went into a back room and came back with such an order signed by the accused. He heard the voice of accused speaking in such back room. He procured one thousand dollars from McDonough to deposit with the bond and warrant clerk, and went to the office of such clerk with the money and the order fixing bail, there deposited the money and the order, and received an order directed to the prison-keeper at the city prison for the release of Imperiale. He went back to the courtroom with this order, and showed it to Filippini, who was still there. The prisoner had in the meantime been taken to the city prison. The order for release was taken to the city prison and delivered to the officer in charge, and Imperiale was discharged from custody at 11:55 A. M.

This story is absolutely uncorroborated in so far as any competent evidence directly implicating the accused is concerned. Moreover, in certain essential details it is opposed, in our opinion, to a clear preponderance of the testimony, altogether regardless of the denials under oath of both accused and McDonough. The latter denies that he had anything whatever to do with the case, beyond furnishing on application, in the course of his business, the money to be deposited as bail, and says he never communicated with the accused in relation to the case. The accused testified that McDonough never communicated with him about the case, and denied that he ever made any ''no bail order'' or said anything about such an order to anyone. He further testified that having first fixed the cash

bail at two thousand five hundred dollars on the statement of the arresting officer, he reduced it to one thousand dollars, *before leaving the courtroom,* his best recollection being that he so reduced it on the application of Mr. N. C. Coghlan, who came into the case by arrangement with Riccardi.

In so far as appears, except for Riccardi's testimony there is nothing to suggest even a suspicion of wrongdoing in the matter of the original fixing of bail. When the application was made by Mr. Filippini, the accused said he would have to wait for the arresting officer's statement. When the officer arrived, he told the accused that the case was a serious one, of deliberately running down a little boy and killing him. He also said something about previous negligent driving by Imperiale. The accused then made the order, and when Filippini protested and said it should be reduced to one thousand dollars, somewhat impatiently said the order had been made and would stand. This is, in substance, the testimony of Mr. Filippini. To us, in view of the seriousness of the charge and the statement of the arresting officer, the amount so fixed does not appear excessive—certainly not so excessive as to suggest improper motive. Much is made of the fact that on cross-examination the accused could not remember ever having fixed so high an amount of bail in a case of involuntary manslaughter, and that he admitted that in the ordinary case of this character, where generally the party charged was the employee of some person of known responsibility, the bail was fixed at a sum which appears to us absurdly low. But here it is not disputed that neither Mr. Filippini nor Imperiale was known to the accused, and, according to Mr. Filippini's testimony, the officer's statement was such as to make the matter seem very serious in so far as the defendant therein was concerned.

As to the alleged subsequent order of "no bail" there is no competent evidence whatever. Of course such an order would be absolutely without warrant in law in any but a capital case, and if there were any competent evidence showing the making of such an order by accused, or the willful doing of anything for the purpose of making Filippini believe that such an order had been made, it would constitute most substantial corroboration of Ric-

cardi's story. There is no record of any such order, and
no one testified to having heard the accused make either
any such order, or any statement designed to convey the
idea that such an order had been or would be made. The
only possible foundation for any claim that the accused
made any such order or statement is a statement made by
the clerk of the court (since deceased) to Mr. Filippini
when, in company with Riccardi and Mrs. Imperiale, he
returned to the courtroom after court had adjourned and
the judge had departed, and while the matter of his with-
drawal was still unsettled. Mr. Filippini testified substan-
tially that the clerk then informed him that the accused
had made an order of "no bail," which was "the last
straw," and it was at once concluded that he could do
nothing for Imperiale, and he withdrew. We have no
doubt of the truth of Mr. Filippini's testimony, and must
accept it as an established fact in the case that the clerk
of the court so stated to him. In view of certain insinua-
tions in the course of the proceeding before us as to his
attitude and testimony, we feel that it is due him to say
that in our opinion there was nothing in his conduct in
this very disagreeable episode in his professional career to
reflect unfavorably in the slightest degree upon his char-
acter, and that his testimony throughout appears to us
to be that of a fair and intelligent witness, sincerely en-
deavoring to state the whole truth. This statement, how-
ever, of the clerk to Filippini, and, as Riccardi claims, to
him, was admitted solely for the purpose of showing the
influences directly used upon Filippini and Imperiale to
bring about Filippini's withdrawal. Of course as against
the accused, this testimony as to what the clerk said that
the accused said was incompetent to show that the accused
in fact said it, and objection was duly made to its being
considered for any such purpose. Unfortunately the clerk
died without having testified in any of the investigations
relative to the matter before us. We have no disposition
to needlessly say anything unfavorably reflecting upon his
memory, especially in view of his inability to reiterate, ex-
plain, or deny, but it is obvious that he may have made
this statement to Filippini without having any direction or
information from the accused, and for the very purpose of
assisting Riccardi in his effort to obtain Filippini's with-

drawal. As the case now stands before us, such a theory is as probable as the theory implicating the accused. Strange as it may seem, the undisputed evidence is that the clerk of this court kept no record of orders relative to bail, and was not expected to keep any such record, even though the same were made in open court. If this be true there was no occasion for the judge to acquaint him with the fact of any such order. Then, too, the discussion hereinafter contained as to the proof relative to the final order fixing the bail at one thousand dollars indicates that such order was made before the judge left the courtroom. Regardless of all this, however, under most elementary rules, evidence of this statement of the clerk was inadmissible to show the making of an order or statement by the accused.

It is, however, in respect to the final order on bail, the order fixing the bail at one thousand dollars cash, that the story of Riccardi is opposed to the clear preponderance of the evidence. This was the order said by him to be made *after* Filippini's withdrawal and his own employment, and *because of* such change in attorneys. It is the testimony of all that this change in attorneys was not consented to until after court had adjourned for the day and the accused had left the courtroom. To obtain a reduction of the bail at that stage, it is admitted that it was essential to obtain an order fixing the bail at the reduced sum, signed by the judge, which, when deposited in the office of the bond and warrant clerk with the amount of bail so fixed, would authorize that officer to issue an order of release. Such an order, we have seen, Riccardi testified he obtained at McDonough's place of business. No such order has been produced. Furthermore, no one, except Riccardi, testified that he ever saw any such order. Mrs. Imperiale, who accompanied Riccardi to McDonough's place of business, would not testify that she saw or was told of any such order. In passing it may be said that Riccardi's visit to McDonough's place at this stage is entirely explainable upon the theory that it was for the purpose of securing the one thousand dollars to deposit as cash bail. Filippini testified that he was not shown any such order. There is absolutely no scrap of affirmative evidence, except that given by Riccardi, to the effect that any such signed order ever was in existence. And in so far as the official record evi-

dence goes, it is opposed to the theory that there was any
signed order fixing bail, and also opposed to the theory that
the reduction to one thousand dollars was made after the
adjournment of court, and Filippini's withdrawal from
the case. The uncontradicted evidence of many witnesses
is to the effect that there was a difference in the form
of the order of release issued by the bond and warrant
clerk, between those issued when the amount of bail was
evidenced by a signed order of the judge, filed in such
office, and those issued when there was no such order, and
it was stated at the office by the party depositing the bail
that the amount had been fixed in open court, without a
signed order. In the latter class it was the uniform cus-
tom to accept the statement of the party as to the amount
and to issue the order of release specifying the amount
of the deposit, in view of the fact that the prison record
showed the amount fixed in open court, if it was so fixed
without a signed order, and if the fact of an order in ac-
cord with the representation stated and shown in the order
of release did not appear in the prison record, the order of
release would not be honored. If, however, there was a
signed order fixing bail, which might be made out of as well
as in court, and of which, consequently, there would be
no prison record, it was the uniform custom to stamp
with a rubber stamp, in one corner of the order of release,
the words "This bail has been fixed at above sum by order
of ——, Judge of Police Court, No. ——," filling in the
blanks with the name of the judge and the number of his
department. The order of release in this case was pro-
duced in evidence, and *is without these stamped words,*
showing, therefore, if the uniform custom was followed,
as we may assume, that it was issued upon the representa-
tion to the bond and warrant clerk that an order had been
made in open court, and that it was *not* issued upon an
order signed by the accused. In addition to this we have
the city prison register in evidence, together with the
testimony of Officer Norman, a prison-keeper, who himself
made the entry of one thousand dollars in the appropriate
column thereof relative to Imperiale on that day from the
sheet returned to him by the court bailiff with the prisoners
still in custody, including Imperiale, when such bailiff re-
turned such prisoners to the city prison after the adjourn-

ment of court. These prisoners had been so returned when Riccardi went back into the courtroom, after his visit to McDonough's office to obtain, as he said, the order fixing bail. The testimony of Officer Norman was clear and convincing, and, with his entry in the register, shows that when Imperiale was returned to the city prison that day, the court sheet returned with him showed a notation by the bailiff of the fact of his admission to bail in the sum of one thousand dollars cash. Officer Bates, the bailiff of the court, testified that he heard the accused first fix the bail at two thousand five hundred dollars cash, and that later, before leaving the bench, he told him to make the bail one thousand dollars cash. He further testified that he saw Mr. Coghlan go up to the bench and speak to the judge before this reduction. In consequence of this direction, in making notes on his daily list of prisoners at the close of court, he made a note of the fact that the bail had been so fixed, and it was this sheet returned to the prison with the prisoners from which the prison record was made. This notation, so far as appears, was the only record made of any order fixing bail in the Imperiale case. It is difficult to understand the reason for the looseness of the practice apparently prevailing in this department in the matter of bail orders made in open court, a practice entirely without sanction in law, but the evidence is undisputed that such "orders" were frequently made by orally notifying the bailiff of the amount, and the bailiff was expected to make the record thereof by noting the amount on his daily sheet, for delivery to the prison authorities. The judge sometimes made a note on his personal docket and sometimes made no note. In this matter no entry at all appears on his docket. He explains this by saying that he made his entries for the information of the bailiff in filling out his sheet for the prison authorities, and that if the bailiff was personally notified by him, there was no necessity for such an entry. Mr. Coghlan has a very dim recollection that while court was in session that morning he, as an attorney acting on behalf of Imperiale, requested a reduction of bail to one thousand dollars, but his recollection is confessedly so dim as not to assist materially. Just what prompted the reduction of two thousand five hundred dollars to one thousand dollars by the accused

does not satisfactorily appear to us, except that there is nothing to our minds satisfactorily establishing any improper influence operating on the accused in so doing, but the clear preponderance of evidence, excluding altogether from consideration the testimony of the accused and McDonough, and accepting, as we do, everything testified to by Mr. Filippini to be true, is to the effect that there was no signed order fixing bail, and that the final order fixing bail at one thousand dollars cash was made before the judge left the courtroom and before Filippini had withdrawn from the case. This being the situation, the case necessarily fails for want of proof in so far as the accused is concerned, both as to the theory of a no-bail order for the purpose of accomplishing the withdrawal of Filippini, and the reduction to one thousand dollars, as soon as Riccardi was employed. It is suggested that there was an admission of wrongdoing on the part of accused in an interview between him and Riccardi in the presence of certain newspaper men, but we do not so construe the conduct and words of the accused, as testified to by Mr. Warner, one of the newspaper men. We have discussed the evidence in relation to this specific charge at considerable length in view of the fact that it is the charge mainly relied on. [1] We are satisfied that it may not fairly be held that the charge is sufficiently sustained by proof to warrant us in finding the accused guilty thereon.

The two remaining charges are that accused in each of two matters pending before him as a committing magistrate, one being the case of L. Ysussi, charged with assault with intent to commit murder, and the other being the case of G. Pasquale, charged with assault with intent to commit rape, agreed to receive, and did receive, a bribe of one hundred dollars from Peter P. McDonough upon the corrupt understanding and agreement that he should thereby be corruptly and unlawfully influenced in the decision of the case, and that he was thereby corruptly and unlawfully influenced to dismiss, and did dismiss, each of said cases corruptly and unlawfully. As to both these charges, the only direct evidence of guilt on the part of accused is that of Riccardi, the attorney for the defendant in each case. He testified as to an arrangement in each case with McDonough, to whom he agreed to pay one hun-

dred dollars to obtain a dismissal. He said substantially that McDonough said the amount was so small he would give it all to the judge. The cases were dismissed on different dates. Upon the dismissal of each case he paid the stipulated one hundred dollars to McDonough in his place of business. Accused was present on each occasion. As each payment was made McDonough delivered the money to the accused, who accepted it. So runs Riccardi's story. It is absolutely denied in all respects by both accused and McDonough. There is no such corroboration of Riccardi's evidence to be found in the record of these matters before the accused and his conduct as a magistrate with relation thereto, which was the only corroboration attempted, as in any degree to add to the weight of such evidence in so far as it purported to sustain the specific charge made. As to the Pasquale case, the assistant district attorney, Mr. W. P. Caubu, testified substantially that he stated to accused in open court that it was not a proper case for holding for trial in the superior court and consented to a dismissal, and a reading of the evidence introduced before the accused does not satisfy us that he was in error in so recommending. The evidence in the Ysussi case was not such as to make it clear to us that the defendant should have been held for trial. As to each of these specific charges we have, in the last analysis, only Riccardi's uncorroborated story, and it produces no measure of conviction in our minds. Therefore, each of these charges must fail in this judicial proceeding for want of proof.

We desire to say that we fully appreciate the motive of the Bar Association in instituting this prosecution, as well as that in the Sullivan case, and the courteous and able assistance given us on the trials by the committee conducting it. We are fully aware that nothing but a most commendable desire to rid the bar of members believed by the members of the association to be unworthy prompted the making of the charges, and it may well be that their reasons for their belief were well based. [2] But certainly charges of specific misconduct on the part of a member of the bar can be sustained by a court only upon satisfactory proof of the particular misconduct alleged, and that proof is, to our minds, wanting here.

The order to show cause is discharged and the proceeding dismissed.

Shaw, J., Wilbur, J., and Lennon, J., concurred.

Olney, J., and Sloane, J., dissented.

LAWLOR, J., Dissenting.—I dissent.   According to the evidence of the accuser, Riccardi, in the corridor before court convened, was told by the officer who made the arrest about Imperiale and his owning three Pierce-Arrow automobiles. Riccardi scented the chance to work the system, so he immediately went to McDonough's and, upon a promise to share the fruits of the enterprise with him, enlisted his co-operation.   Riccardi then went to the courtroom, where he was a witness of the proceedings.   When the accused came on the bench the case was called but the determination of Mr. Filippini's application for bail was deferred until the officer appeared.   The statement of the officer that it was a serious case, which was accepted by the accused, and the order of bail of five thousand dollars bonds or two thousand five hundred dollars cash followed. Mr. Filippini took issue with the statement of the officer and addressing the court stated he had known the defendant, that he was a responsible man, and applied for lower bail.   The accused, in a loud voice, answered, "That is the order."   Mr. Filippini replied, "Very well, if that is the case I will see if I can raise it."   Riccardi promptly returned to McDonough and informed him that Mr. Filippini was going to secure bail, and said McDonough had better send word to the judge to order higher bail, or no bail.   This McDonough promised to do.   A man at once left McDonough's office to go to the courtroom and Riccardi followed him.   When Riccardi reached the courtroom he observed McDonough's man speak to the accused at the bench, and presently, as the accused was leaving the courtroom, he stopped to speak to Clerk Kane.   Neither of these conversations was heard by Riccardi.   Riccardi next proceeded to try to get the case.   He first had a conversation with Mrs. Imperiale outside the courtroom, the gist of which was that for five hundred dollars he would secure bail and Imperiale's release in ten or fifteen minutes; he also promised a dismissal of the case without a trial on the merits.

As Mr. Filippini reached the sidewalk to take his auto-
mobile, Mrs. Imperiale came running up to tell him about
what Riccardi, a man she did not know, had said to her.
They went back into the building, met Riccardi, and after
some talk near the telephone booth the trio entered the
courtroom. The Riccardi proposal was taken up and dis-
cussed with Imperiale, who was in the dock. Mr. Sapala,
Mrs. Imperiale's brother-in-law, was in the party. While
this conversation was in progress, Clerk Kane interrupted
Mr. Filippini, whom he knew, and said to him, ''Mr. Filip-
pini, by the way, you recollect in that Imperiale case this
morning—the court has made a no-bail order. 'Is that so?'
I said, 'This is worse and more of it.' '' Mr. Filippini then
told Imperiale he did not want anything to do with Ric-
cardi, ''because he has a different system of handling cases
in this court than I have,'' and left Imperiale to decide be-
tween them. Mr. Filippini finally said, ''Well, now, I will
not have anything further to do with the case. Now, you
will have to take Mr. Riccardi. It is worse and more of
it now. I will not have anything more to do with it.''
The retirement of Mr. Filippini and the employment
of Riccardi came in quick succession. Riccardi, accom-
panied by Mrs. Imperiale and Mr. Sapala, then went
to the office of McDonough. Riccardi entered a rear
room, where McDonough joined him, Mrs. Imperiale
and Mr. Sapala remaining in the waiting-room. In the
conversation between Riccardi and McDonough the former
proposed that the bail be fixed at one thousand dollars.
McDonough went into another room and Riccardi states
that while McDonough was in there he heard the voice
of the judge. McDonough returned with a bail order
of one thousand dollars signed by the accused, which
he gave to Riccardi, together with one thousand dollars
in currency. As Riccardi passed out he delivered an
eulogium upon his own cleverness and told Mrs. Imperiale
to go to his office. He took the bail order and the currency
to the office of the warrant and bond clerk, received a signed
order of discharge, and returned to the courtroom to have
Imperiale released, but he found Imperiale had been taken
back to the city prison. The order of release was exhibited
to Mr. Filippini, who had remained to witness the outcome

of the bail matter, and the city prison records show that Imperiale was discharged from custody at 11:55 A. M.

The ultimate question to be decided is whether Riccardi's testimony is sufficiently corroborated to warrant an inference that the accused was a guilty participant in the scheme to eliminate Mr. Filippini from the case and fleece Imperiale out of five hundred dollars.

From my own analysis of the evidence I am convinced it is shown not only that the accused had a hand in victimizing Imperiale, but that the fraud could not have succeeded without his co-operation. Riccardi, like a bird of prey, was waiting in the hall of justice for something to turn up, especially among his own countrymen. He testified he did not know Imperiale. Somebody having knowledge of the case, therefore, must have told him about it and that Imperiale had property. It is not suggested how he got the information, if it was not from the officer. The officer said he had known Riccardi slightly for three years, that Riccardi first broached the subject, asking him if Imperiale was charged with manslaughter. It is conceded Imperiale was not to blame for the death of the child, and the question arises, Why did the arresting officer report to the accused it was a serious case? Did the accused know about the charge against Imperiale when he convened court? It was the custom of the accused, according to his own testimony, to reach the neighborhood of the Hall of Justice half an hour before court time. He admitted that on such occasions he sometimes conversed with McDonough at or in front of his place of business about cases that came before him, but he made the same qualification as did the accused in the Sullivan disbarment proceeding—they never mentioned felony cases. I shall not repeat what I said in that case about McDonough's activities in the police courts as a professional bail-bond broker and his relationship with Sullivan, for the majority opinion states the same conditions prevailed between the accused and McDonough. I am sure no member of this court doubts that McDonough would speak to the accused about any case before him if he had any interest in it, and it is idle to think he did not speak to him about the Imperiale case. The accused and McDonough deny they saw each other that morning, or that the case was ever mentioned between them. In regard

to what is said in the main opinion about the amount of the
bail fixed by the accused, it is proper to point out that
the question is not what would be proper bail in a man-
slaughter case, but rather whether the accused in this par-
ticular manslaughter case departed from *his* usual stand-
ards in such cases. If he did, it is a circumstance against
him, independent of what would be proper bail. I think
the accused showed every evidence of having an unusual
interest in the case. He adopted completely the appraisal
of the arresting officer without asking for or receiving the
testimony of Imperiale or his witnesses as to the facts of
the charge, and when Mr. Filippini explained his relation-
ship with and knowledge of the character of the defend-
ant, he sustained the order of bail with a warmth wholly
unaccountable upon any theory of judicial balance. His
demeanor and action were well calculated to inspire the
defendant and his distracted wife with fear and apprehen-
sion, and to render them the more susceptible to Riccardi's
devices. It must be kept in view that no record was made
by either the accused in his docket or the clerk in his
minutes, or the bailiff on his sheet, of this bail order, a
circumstance not depending on Riccardi's testimony and
which tends to justify an inference that the original order
was only pretended to be made to help the scheme along.
Such an entry might be evidence against him. I do not
agree with the prevailing opinion that there was not even
a suspicion of wrongdoing in the original fixing of bail.
However, the solution of the first fixing of bail must de-
pend in part upon what followed, and when all the evi-
dence is considered no doubt will remain that it was a
part of the plan to drive Mr. Filippini out of the case and
make way for Riccardi.

With regard to the statement of Clerk Kane to Mr. Filip-
pini that the court made a ''no-bail'' order: The testimony
of Mr. Filippini is sufficient to prove it was made to him,
and to corroborate Riccardi's testimony on the point, not-
withstanding the bailiff testified that while he was in close
proximity to Clerk Kane at the time he did not hear the
conversation. I do not agree with the majority opinion
that it is as probable Clerk Kane made the statement to
assist Riccardi as it is that it implicated the accused. To
my mind, the more natural inference, and the one more in

keeping with the presumption of innocence and a regard
for the memory of the deceased clerk, is that he acted upon
the direction of the judge of the court. The presumption
would be that the clerk regularly performed his duty and
obeyed his superior officer. However, applying the presump-
tion of innocence to the accused, the question arises, Is it
likely the clerk would take the risk of making an unauthor-
ized statement with the liability of exposure when Mr.
Filippini became aware such an order was without warrant
of law? The fact the "no-bail" order did not appear in the
Judge's docket does not help the case of the accused for the
reason that the original order of bail was not entered therein.
With respect to the failure to produce the "no-bail" order I
shall later refer to the method of transacting business in
that department and the practice of ignoring the plain pro-
visions of the law. I concur with the majority opinion
that the statement itself is only admissible for the limited
purpose of showing its effect on Mr. Filippini and the Im-
periales. The fact, however, that the accused, after Mc-
Donough's man had spoken to him at the bench, stepped
over to the clerk's desk to speak to him, is substantive evi-
dence against the accused in the chain of circumstances
relied upon by the accuser, to be given such weight as
each justice may deem it entitled.

Now, as to the final order of bail: It will not be ques-
tioned that if the accused only pretended to make the origi-
nal order of bail it would follow that McDonough also
dictated the final order. The two events stand or fall
together. The accused knew that Mr. Filippini had left the
courtroom to raise the original bail and that he made no
report to the court. It is not disputed the final order
was made without any reference to this circumstance. Fur-
thermore, it is plain the Imperiales and Mr. Filippini, when
they learned of the no-bail order, despaired of securing bail
except through the medium of Riccardi, for the substitution
of attorneys immediately followed. It is clear that if Ric-
cardi was not responsible for McDonough having the final
order made it must have been made without regard to Mr.
Filippini and the Imperiales, for, as I have shown, the
accused had curtly denied the application for lower bail
and Mr. Filippini had left the courtroom to secure bail on
the original order.

This brings me to a consideration of the affirmative defense interposed by the accused, in addition to the denials of himself and McDonough, that the Imperiale case had ever been mentioned between them. It was not claimed that Riccardi had ever mentioned the subject to the accused and McDonough testified that Riccardi never spoke a word to him about bail in the Imperiale case. The testimony of the accused is to the effect that before he left the bench on that morning, on the application of Mr. Coghlan, the final order of bail was made. McDonough supplemented his above denial with the admission that Riccardi did come to his office on that morning, accompanied by Mrs. Imperiale and Mr. Sapala, and that Riccardi merely said they were waiting for Mr. Coghlan. McDonough also testified that Mr. Coghlan applied to him for one thousand dollars for bail in the Imperiale case and that he gave it to him. Mr. Coghlan was called as a witness to support the defense, but his testimony is so intrinsically indefinite that it would not support a finding that he had anything to do with procuring bail for Imperiale. For instance: If Mr. Coghlan figured in the matter of bail, he must have done so during the forenoon of April 24th. The record shows the following: "Q. What time of the day was it? I mean as to before or after noon. A. It was in the afternoon." In other connections in his testimony the time is given as "in the forenoon" and in one instance the expression "in the morning, of course" was used. His testimony as to his applying to the accused for the bail order is, if anything, less definite. He admitted he did not know the time when, or the place where, he made the application, except that the court "would be naturally the place where it occurred." He also admitted that he appeared in the trial of a case in the superior court the same morning and names the case and the department in which it was tried, but every effort failed to get him to make a definite statement as to the circumstances under which he came to ask for bail, when he asked for it, or what he did with the bail money when he got it. It is difficult to understand why, if there is any foundation for his testimony, he could not recall the circumstances under which he applied for the order and secured the money from McDonough, for it is conceded that as Riccardi contemplated an early visit to the eastern

states, he employed him to try the Imperiale case; that the bail was put in his name, and that he represented Imperiale during the absence of Riccardi until May 23d, when the charge was dismissed, at which time $250 was paid to him by Mr. Filippini.

It also appeared that the relations between Riccardi and Mr. Coghlan were of an intimate character, for at that time he was representing Riccardi personally in a criminal action and had been associated with him in other professional employment.  Every reason is seen why he should be able to recall the circumstances, especially as it appears that he testified in a grand jury investigation of the Imperiale case about a year before he gave testimony in this proceeding.  He does not even intimate that he gave the bail to the warrant and bond clerk, or that he had anything to do with the issuance of the order of release, or its presentation at the city prison.  I am satisfied from the evidence that he never had anything to do with the matter of obtaining the order or securing the one thousand dollars bail money; that it was an invention pure and simple, and that he was brought into the proceeding to save the accused and McDonough, with whom for years he has been on terms of friendship.  If Riccardi's testimony is entirely left out of view, and the transaction as it is revealed in the testimony of Mrs. Imperiale and Mr. Filippini is considered, this affirmative defense cannot stand.  It throws out of balance every other circumstance in the case.  Mr. Coghlan does not claim he spoke to either of the Imperiales or Mr. Filippini at that time, and the accused admits he did not mention to him that Mr. Filippini was representing Imperiale and had left the courtroom to get bail.  The truth doubtless is that pressing Mr. Coghlan into service in this proceeding came as an afterthought.  It appears that his connection with the Imperiale case got into the newspapers during the grand jury investigation; that one day in February, 1920, when he came home at 1 o'clock in the morning, the accused and McDonough were waiting for him in front of his house, and that the following Sunday he visited Riccardi at Los Gatos.  He denies, however, that this visit had anything to do with the investigation.  It is equally clear to me that the accused put Mr. Coghlan forward because of his conceded connection with  the Imperiale case in the expectation that his testi-

mony would refute Riccardi's story, minimize the effect of the testimony of Mr. Filippini and Mrs. Imperiale, and, upon the entire evidence, inject a doubt into the case.

But if the testimony of Mr. Coghlan lacked definiteness, that of the accused and McDonough is not open to the same comment, for it is plain they have not hesitated in their testimony to state that the bail was effected through Mr. Coghlan. Unquestionably this testimony is willfully false and furnishes corroboration of the story told by Riccardi. Innocent men do not commit perjury, nor seek to induce others to do so, and under a familiar rule of evidence their entire testimony should be distrusted. So far as their testimony is concerned, that of Riccardi should stand as undenied. It is worthy of note that when the accused was examined by the grand jury he made no reference to Mr. Coghlan making application for bail. The bailiff of the court testified that he saw Mr. Coghlan approach the accused while he was on the bench that morning and speak to him. On cross-examination he stated that within a few minutes after Mr. Coghlan left the accused told him to make the bail one thousand dollars. "Q. At that time did you connect Mr. Coghlan with the reduction of the bail? A. I did not at that time, but I did very soon afterward. Q. How soon afterward? A. Well, I saw Mr. Coghlan in the case and then when the case came up there was a question of bail. I always did believe—I don't know—that Mr. Coghlan had that bail fixed. . . . I believe it. I don't know it." His attention was called to his testimony before the grand jury where he answered "Not that I know of" when he was asked if anyone else made application for a reduction of bail after the first order was made; also that he answered "I would not" when he was asked if he would know the man who asked to reduce the bail. "The Court: You testified that way before the grand jury? A. I did. Q. Mr. Webb wanted to know why you didn't tell them that you knew it was Mr. Coghlan? A. I didn't know it was Mr. Coghlan and I don't know it now."

The main opinion does not discuss this affirmative defense, as such. It does, however, suggest that Riccardi going to McDonough's when he claimed he obtained the bail order signed by the accused "is entirely explainable upon the theory that it was for the purpose of securing the one thousand dollars to deposit as cash bail." This is at once a con-

cession that Riccardi and not Mr. Coghlan got the bail from McDonough, and that Riccardi deposited it. In connection with the accused's testimony that he reduced the bail to one thousand dollars before leaving the courtroom it is stated, "his best recollection being that he reduced it on the application of Mr. N. C. Coghlan, who came into the case by arrangement with Riccardi." The only reference in the opinion to Mr. Coghlan's testimony is that he "has a very dim recollection that while court was in session that morning, he, as attorney acting on behalf of Imperiale, requested a reduction of bail to one thousand dollars, but his recollection is so dim as not to assist materially." It is to be noted the opinion does not state Mr. Coghlan had come into the case on that morning, or that he acted as attorney for Imperiale for the purpose of bail. No other reference is made to the testimony of the accused that Mr. Coghlan was connected with the bail matter, and the testimony of McDonough is not mentioned at all.

I have expressed myself in the Sullivan disbarment proceeding to the effect that Riccardi testified under conditions peculiarly calculated to induce him to tell the truth. I also referred to the system which prevailed in the police courts at the time material here and the evil influence a professional bail-bond broker like McDonough would exercise upon the administration of justice. All that I said then applies with equal force in this proceeding. Yet we are urged to believe that in the Imperiale case, where McDonough's money was at stake, the subject was never mentioned by him to the accused. Inferences are just as much evidence as are the facts from which they may be drawn, and the irresistible inference arising from the entire evidence is the inference which the Imperiales and Mr. Filippini drew from the action and bearing of the accused, the statement of Clerk Kane, the securing of lower bail by Riccardi, his production of the bail money, and the release of the prisoner—that Riccardi was dealing with forces superior to the law itself. I cannot see that there can be any ground for doubt that the accused was apprised of the Imperiale case before he went on the bench that morning, that the amount of bail was unusual for *him* to set, that he resented Mr. Filippini's remarks and his insistence on lower bail, that he advisedly refrained from entering the bail order in his docket, that he made the bail order

at the suggestion of McDonough, and not on the application of Mr. Coghlan, and that Riccardi saw McDonough on the three occasions he has described, that through McDonough he got the bail order and from him received the bail money, and that he deposited the bail and secured the order of release.

In the face of the inferences, which indisputably arise from the evidence viewed in its entirety, Riccardi's testimony assumes a secondary importance—the silent and impressive circumstances surrounding the transaction indubitably showing that while Riccardi never spoke to the accused about the case, the stealthy influence of McDonough was at work. The vital question in the case is, *Why* did the accused make the final order of bail? The majority opinion does not purport to rely on the testimony of the three principal figures in this defense—it does not deem Mr. Coghlan's testimony of material assistance and, with the exception of the one allusion to that of the accused, it ignores both his testimony and McDonough's on the point. Concededly, if this defense were established the case of the accuser would fail. On the other hand, if it was founded on perjury no question of the sufficiency of the evidence to corroborate Riccardi's testimony should remain. The main opinion concludes that the testimony of Riccardi implicating the accused is "absolutely uncorroborated," and it further holds that in certain essential details it is opposed to a clear preponderance of the evidence independently of the denials of the accused and McDonough. This position rests upon three propositions—there was no suggestion of wrongdoing in the fixing of the original bail, there is no competent evidence that a "no-bail" order was made, and, apart from the testimony of the accused and McDonough, and accepting everything Mr. Filippini testified to as true, the clear preponderance of the evidence is to the effect there was no *signed order* fixing the final bail, but that it was made before the accused left the courtroom. The first two propositions have been discussed by me, and I shall now consider the third.

It is to be noted the opinion does not state upon whose application the final court order was made, but in view of what it has said concerning Mr. Coghlan's testimony I may assume it does not conclude the application was made by him.

The majority view is that Riccardi is not corroborated as to *how* and under what circumstances the final order was made, and, therefore, the accusation fails of proof. It is pointed out in the opinion that, under the practice followed in the issuance of orders of release on bail, the order of release admitted in evidence would indicate the accused had not made a signed bail order, but that it was made in open court. The order of release is on blue paper, but does not contain a rubber-stamp notation, and hence the omission means, according to the evidence, that the party depositing the bail must have stated to the warrant and bond clerk the order was made in open court, thereby refuting Riccardi's testimony that McDonough delivered to him in his office an order of bail signed by the accused. This must be so, it is argued, for the reason that under the evidence, if the order of release had contained the rubber-stamp notation, it would have been returned to the warrant and bond clerk, because the sheet, which had been delivered to the bailiff that morning and upon which, as he claims, he had made the entry at the close of the session, shows the final bail order was made in open court.

I have not been able to accept the testimony of the bailiff that the entry on the sheet was made in pursuance of the direction he testified he received from the accused to "make the bail in the Imperiale case a thousand dollars." According to the testimony of the city prison officials and the records of the office the entry must have been on the sheet when it was delivered with Imperiale at the city prison. The bailiff was the only witness to the records who claimed to have an independent recollection of the Imperiale case as of the time it came up. For some unexplained reason bail orders in this department of the court were customarily given to the bailiff instead of to the clerk in matters coming up during the court proceedings. The conventional way, of course, would be to give all orders, bail and otherwise, to the clerk and for the bailiff to get his information from him. In this way a court record would be kept of the court business. This was not done in this department, at least so far as bail is concerned. The charter provides that the *clerk shall keep full and complete records* of all cases in the court *and the disposition* made thereof by the court (art. V, c. 8, sec. 10). The bailiff is to preserve order and to execute the orders of the court

(Id., sec. 14). Besides the Imperiale case there were eleven other cases on the sheet that day, the information as to the disposition of which the bailiff testifies he got from the judge's docket, but as to the disposition of the Imperiale case he relied entirely on his memory and, indeed, could not say whether the docket contained any mention of it. I have heretofore touched upon his testimony as to Mr. Coghlan's asserted connection with the bail. The testimony of this witness, who, it seems, kept in his possession a duplicate of all these sheets, leaves some doubt in my mind as to the records of the Imperiale case, but I am free from doubt that the bail order was not made as testified to by him.

Now, as to the order of release. Riccardi first testified that a man connected with his office deposited the bail. He finally testified, however, that upon further reflection he must have made the deposit and received the order of release himself. Both Riccardi and Mr. Filippini, to whom, according to the testimony of both, Riccardi exhibited his release, said it was on blue paper, but apparently neither of them was questioned as to whether it contained the rubber-stamp notation. Mr. Filippini was so surprised and deeply interested in Riccardi's performance in securing bail that he went to see and had a long talk with the warrant and bond clerk after the order of release was exhibited to him by Riccardi, but this conversation was properly excluded. It does appear, however, that when Mr. Filippini entered the office a white paper dropped on the floor and that the incident was discussed between them, but what was said is not shown. Apart from the contention as to whether Riccardi received the bail order in McDonough's office, no particular importance should attach to the circumstance of whether or not a bail order was signed in any given instance, for when the accused was asked whether it was not the custom in his department of the court to sign an order of bail even when the order of bail was made in open court, he answered, "Yes, it was usually done; that in a few cases it was not done." It was probably the rare exception not to sign an order in that department, for otherwise the records of bail would, in most instances, depend on the bailiff of the court. No special stress, therefore, should be laid merely on whether or not a bail order was signed, nor on the failure to produce a signed order, for at that time no effort was made to preserve them.

The determination of the question as to the order of release must rest on the action of the two officials—the bailiff in furnishing the data for the city prison records, and the warrant and bond clerk in issuing an order of release minus the rubber-stamp notation. As I understand the matter, no record was kept by the warrant and bond clerk which would show who deposited the bail, nor the representations by such person in cases where a signed order of bail is not produced. The warrant and bond clerk has no independent recollection of the occurrence, and upon the face of the records, it would seem that the depositor of the bail must have represented that a signed order of bail had not been made. In my opinion, this was not the fact, and the truth of the matter must be sought elsewhere. It may be argued that if the bail was deposited by the man in Riccardi's office (he did not appear as a witness), he may have assumed and stated to the warrant and bond clerk the bail order was made in open court, and if by Riccardi himself, he may have declared it was a court order so as to protect the system against exposure, for he has testified that all his operations in that department were carried on through McDonough and never with the accused himself. These, however, are mere conjectures, and upon the evidence as to the contents of the order of release and the circumstances under which it was issued I entertain such a doubt, that if the decision turned on this question alone, I would resolve it in favor of the accused.

But it cannot be held that this question is decisive. The evidence as to *why* the accused made the final order of bail is so convincing I have no doubt of his guilt. Riccardi and the officer agree they had the conversation in the corridor that morning some time before the accused went on the bench. The officer left and Riccardi proceeded to McDonough's and had his first interview with him about the Imperiale case. It is unnecessary to again review the proceedings in court which resulted in Mr. Filippini leaving to get bail. Riccardi had his second interview with McDonough and was preceded to the courtroom by McDonough's man, who spoke to the accused. While negotiations were on the accused spoke to the clerk and left the courtroom. Upon the assumption that the bail orders during the proceedings are generally given to the bailiff it is clear why, if there was a "no-bail" order, it was given to the clerk, for otherwise

it would have appeared on the bailiff's sheet. Mr. Filippini retired to get bail and Riccardi made his third visit to McDonough's, obtained the bail money, Imperiale was released on schedule time, and all the surrounding circumstances proclaimed Riccardi as the genius of the occasion.

There was no question in the mind of Mrs. Imperiale, who had waited anxiously at McDonough's for her husband's deliverance, nor of Imperiale when he was released after being returned to the city prison, nor of Mr. Filippini, amazed at the performance, when Riccardi showed him the order of release, as to who had secured the results. In the face of such circumstances the denials of the accused and McDonough should carry no weight. In view of Mrs. Imperiale's great relief at the outcome, too much stress should not be put on her failure to note whether Riccardi, when he emerged from the back room, had a paper in his hand, if that were the way he would carry such a paper, or whether or not he had the bail money.

I have said Mr. Coghlan testified before the grand jury. It is apparent the affirmative defense was never thought of until that occasion, for the testimony of the accused, who preceded Mr. Coghlan on the stand, is barren of any suggestion that the latter applied to him for a reduction of bail. In addition to what I have already said about this defense it is proper to refer again briefly to the evidence. It was through Riccardi Mr. Coghlan was employed in the Imperiale case. Riccardi's movements from the time he spoke to the officer until Imperiale was released from custody are accounted for, and Mr. Coghlan had not been seen by the Imperiales or Mr. Filippini during that time. No one has testified, not even Mr. Coghlan himself, that he was employed to secure bail. The truth of the matter probably is that Mr. Coghlan knew nothing about the case until after Imperiale was released, and that while Riccardi was attending to the matter of bail Mr. Coghlan was engaged in the superior court. It is evident that he only met the Imperiales on that day to arrange to have him try the case while Riccardi was in the east.

The Penal Code provides: "A docket must be kept by . . . the police justice, or by the clerk . . . if there is one, in which must be entered each action and the proceedings of the court therein" (sec. 1428) " . . . The provisions of this

code relative to bail are applicable to bail in . . . police courts'' (sec. 1458). In matters of bail the bailiff seemed to discharge the duties properly belonging to the office of clerk, and only occasional entries were made in the docket by the accused. The evidence does not sustain the theory that it was through ignorance or carelessness the accused conducted the court in defiance of the law, but indicates that the methods followed were intended as a protection to him in carrying on operations such as those charged in the accusation. In the Imperiale case no entry appears of the original or final bail order. The two orders—one fixing and the other reducing the bail—should have been entered. Yet orders of bail in other cases do appear in the docket.

The first bail order was entirely disproportionate to the bail usually fixed by the accused in manslaughter cases, apart from the existing arrangement with the transportation companies in that class of cases. The accused, after the officer testified, said it was a very serious case and apparently nothing had intervened to change his mind as to its gravity. It may be inferred from the excessive bail and the other circumstances that the first order was only tentative. The purported ''no-bail'' order, for obvious reasons, would not be entered. And if the final order had been entered, the question might arise as to why the original order was not entered. If the final order was not made on the application of Mr. Coghlan, why, and under what circumstances, was it made? Concededly, not through either Mr. Filippini or Riccardi.

And it must not be lost sight of that in spite of these charges the accused and Riccardi were on speaking terms, and that they drank together. On an occasion within two months of the hearing, in the presence of some newspaper men, the following colloquy ensued: Judge Oppenheim: ''Did you ever say that you ever did business with me?'' Riccardi: ''Well, no, not exactly, but indirectly a hundred times, and the goods were always delivered.'' Judge Oppenheim: ''Very well.'' Judge Oppenheim then turned around and walked away.

In view of the relationship between the accused, McDonough, and Riccardi, and the system under which they operated, I think the testimony of Riccardi as to the Leandro Ysussi case, in which the defendant was charged with intent

to commit murder, and as to the case of Geralmo Pasquale, involving a charge of assault with intent to commit rape, it being alleged in the accusation that the accused received a one hundred dollar bribe to dismiss in each case, and that he did so, finds ample corroboration in the aggravated character of the cases. The method followed in each of these cases was to make repeated orders of continuance covering several months, and finally, without even the formality of taking the evidence of the defendant, dismiss the case.

The accused should be disbarred.